SILLS CUMMIS & GROSS P.C.
Valerie A. Hamilton, Esq.
vhamilton@sillscummis.com
George R. Hirsch, Esq.
ghirsch@sillscummis.com
600 College Road East
Princeton, New Jersey  08540
Tel.:  (609) 227-4600
Fax:  (609) 227-4646
*Proposed Attorneys for the Debtors and Debtors-In-Possession*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEW JERSEY

| In re: | Hon. Michael B. Kaplan |
|---|---|
| PRINCETON ALTERNATIVE FUNDING, LLC, | Case No:  18-14600 (MBK) (Joint Administration Requested) |
| Debtor-In-Possession. | Chapter 11 |
| In re: | Hon. Michael B. Kaplan |
| PRINCETON ALTERNATIVE INCOME FUND, LP, | Case No:  18-14603 (MBK) (Joint Administration Requested) |
| Debtor-In-Possession. | Chapter 11 |

# DECLARATION OF JOHN COOK IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, JOHN "JACK" COOK, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Executive Officer (the "CEO") of Princeton Alternative Funding, LLC ("PAF"), which is the general partner of Princeton Alternative Income Fund, LP ("PAIF"). PAF and PAIF are the debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

I assumed the role of CEO of PAF in January 2018, after having served as the Chief Operating Officer and Chief Compliance Officer of PAF since March 1, 2016. Prior to working for the Debtors, I was a founder at Terrapin Advisors and was a fixed income trader at Crédit Suisse AG. I hold FINRA Series 3, 7, 24 and 63 licenses.

2. In my capacity as CEO, I am responsible for, among other things, overseeing the Debtors' business and its investments. As CEO, I have extensive knowledge of, and experience with, the Debtors' chapter 11 preparations, the events leading up to the instant filings, the business and financial affairs of the Debtors, and the industry in which the Debtors operate.

3. I submit this declaration (the "Declaration") in support of the First Day Pleadings (defined below). The relief sought in the First Day Pleadings would allow the Debtors to perform and meet the obligations necessary to fulfill their duties as debtors-in-possession and minimize any adverse effects that filing for bankruptcy protection may have on their business. I am familiar with the contents of each First Day Pleading (including the exhibits thereto) and believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) best serves the Debtors' estates and stakeholders' interests; and (c) is, with respect to the cash management system and bank accounts, necessary to avoid immediate and irreparable harm.

4. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals; (c) my review of relevant documents; and (d) my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and industry. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## BACKGROUND

A.  **Industry Overview.**

5. Since the 2008 financial crisis and the regulation that ensued, certain types of lending from traditional banks have dropped precipitously. Compliance costs and regulations requiring banks to improve their capital holdings has resulted in banks having less capital to lend to borrowers seeking financing. Consequently, banks deployed available capital to borrowers demonstrating superior creditworthiness. Alterative lenders have stepped in to fill the borrowing needs of creditworthy borrowers whose credit scores would not qualify for financing from traditional lenders. The borrowers financed by alternative lenders typically have a FICO score below 670.

6. It is estimated that one third of American consumers have a FICO score under 670, creating a $60 billion short term non-prime consumer market for alternative lenders.

**The Debtors and Its Related Companies.**

7. A chart setting forth the corporate structure of the Debtors and their related companies is attached to this Declaration as **Exhibit A**.

8. Debtor PAF is the sole General Partner of the Debtor Princeton Alternative Income Fund, LP, a Delaware limited partnership.

9. Debtor PAIF is an open-ended, Section 3(c)(7) of the Investment Company Act of 1940 debt fund. In addition to having PAF as its general partner, PAIF has ten (10) limited partners.

10. As of January 31, 2018, the net asset value of investments in PAIF was $58,067,895.00.

11. As a debt fund, PAIF provides traditional revolving lines of credit to consumer finance companies who operate in the alternative lending marketplace. "Alternative lending" can take a variety of different forms. The consumer finance companies that PAIF funds include state-to-state lending, lease-to-own and tribe-based lending. These finance companies originate short-term consumer loans that can have default rates as high has 35%. Accordingly, the annual rate of interest on the underlying short term consumer loans extended by the consumer finance companies range between 69% and 270% in order to compensate for the high default rate.

12. As security for repayment of the credit extended by PAIF under the revolving lines of credit, PAIF obtains from each consumer finance company, a security interest in the consumer loans that the finance company originates with PAIF's credit.

13. PAIF was structured as a passive investment vehicle with all investment and operational authority vested in PAF. Investments in PAF were expressly known to involve substantial risk and would be illiquid.

14. One of the investors in PAIF is a limited partner known as Ranger Specialty Income Fund, LP ("RSIF"). RSIF made a series of investments in PAIF between March 2015 and February 2016 totaling $6.8 million.

15. One of RSIF's affiliates, Ranger Direct Lending Trust ("RDLT", and together with RSIF" and their affiliates, "Ranger") invested indirectly in PAIF, through a British Virgin Islands offshore entity or feeder fund, known as Princeton Alternative Income Offshore Fund Ltd. ("PAIF Offshore"). PAIF Offshore is a limited partner in PAIF. Between May 2015 and January 2016, RDLT invested a total of $55.1 million in PAIF Offshore, which in turn invested these funds in PAIF.

16. Thus, the Ranger entities hold indirect (in the case of RDLT) or direct (in the case of RSIF) limited partnership interests in the Debtor PAIF.

17. Ranger has suggested that all of its investments require active Ranger ownership and management. Ranger's stated purpose is directly contrary to the PAIF operational and investment thesis.

18. Upon information and belief, prior to its first investment, Ranger performed substantial diligence about PAIF and received numerous informational presentations, responses to a detailed diligence questionnaire and receipt of investing documents.

19. Ranger originally wanted to control the investment objectives of PAIF, substantially altering the discretion afforded PAF and altering the original investment premise of PAIF. The Debtors rejected Ranger's demands for control over the investment decisions of PAIF and direct ownerships of the PAIF investments. Ranger would only be afforded the same rights as other limited partners in PAIF.

20. Ranger wanted more than the passive investment vehicle contemplated by PAIF. Undeterred, Ranger continued to suggest its intent to invest in PAIF, but it needed additional information requests about PAIF's operations and wanted assurances of the material involvement of MicroBilt Corporation ("MicroBilt") (which indirectly owns a majority interest in PAF through various subsidiaries) in the Debtors' operational and portfolio management. PAIF agreed to certain additional informational concessions and the involvement of MicroBilt. However, Ranger's objectives were not geared toward access to information; they were focused on converting its passive limited partner investment into direct operational and investment control.

21. PAIF began operations in 2015. In calendar year 2015, PAIF posted a return of 14.87%. Ranger elected to receive cash payments of $2,299,070.00 which account for its portion of PAIF's returns.

22. Ranger reaped the substantial returns from PAIF's investment strategy and decided that it wanted to acquire all the investment for its own account.

23. Because of the handsome returns on their investments, in February 2016, Ranger, through its portfolio manager, Gary Melara and its investment advisor Cormac Leech, made an additional attempt to acquire an equity interest in PAF. Ranger's overture was denied and Ranger continued to receive its passive investment returns.

24. When Ranger's overture was denied, Ranger tried to exert leverage over PAIF and PAF through other means.

25. Despite a business plan that sought to diversify the concentration of investors and finance company borrowers, two of PAF's original founders, Robert Farrell and Robert Szostak, failed to undertake efforts to diversify. Instead, during the first year of PAIF's existence, Farrell and Szostak allowed Ranger to be the sole investor in PAIF and, upon information and belief, they became beholden to Ranger.

26. In fact, during the summer of 2015, Farrell and Szostak were entertaining overtures from Ranger to purchase equity in PAF. In addition, during the fall of 2015, Farrell and Szostak were soliciting Ranger for additional investment from another Ranger public offering of $25mm Zero Dividend Preference Shares.

27. Farrell and Szostak were ultimately terminated from PAF for cause, for among other things, failing to fulfill their responsibilities and refusing to seek investments from any source other than Ranger. Farrell and Szostak commenced a lawsuit against PAF in New Jersey

State Court.[1]  They were in contact with Ranger representatives to discuss the lawsuit. Ranger proposed to purchase the equity held by Farrell and Szostak in PAF and sought PAF's consent as a way to resolve Farrell and Szostak's litigation.  That proposal was also rejected.

28.    Ranger then tried to pressure PAF into entering into an equity transaction with Ranger.  Ranger exerted that pressure by issuing a request to redeem RSIF's interest in PAIF and to withdraw RDLT's shares in PAIF Offshore.

29.    The Debtors refused to accede to Ranger's demand to tender the entire investment to Ranger.  For the next six months, between April 2016 and October 2016 Ranger and PAF negotiated to restructure Ranger's investments in PAIF and PAIF Offshore, as is permitted under the governing agreements.  It became clear from the negotiations that Ranger wanted to own PAF and control PAIF and not simply have limited partnership investments in the fund.

30.    During the period between April 2016 and October 2016, through a new management team, and while negotiating with Ranger, PAF continued to bring new investors into PAIF and to make loans to additional consumer finance companies.

31.    I started with PAF on March 1, 2016 along with Jeff Davner and Howard Davner. We replaced Farrell and Szostak as the management team for PAF and immediately began to undertake efforts to diversify PAIF's investor base.

32.    One of the challenges that PAF was facing when I assumed the roles of Chief Operating Officer and Chief Compliance Officer of PAF was Ranger's failed efforts to acquire an equity interest in PAF, their attempts to lend directly to PAIF's underlying consumer finance

---

[1] The primary claims in the law suit commenced by Mr. Farrell and Mr. Szostak in the New Jersey Superior Court constitute derivative claims belonging to the Debtors' estates, making that action subject to removal to this Court.

companies, Ranger's attempts to restructure their investments in PAIF, and its attempts to redeem its shares in PAIF Offshore and withdraw its equity interests in PAIF.

33. On October 28, 2016, before Ranger's redemption and withdrawal rights ripened, PAF issued to RSIF and RDLT a mandatory withdrawal and redemption notice in accordance with the PAIF Limited Partnership Agreement and the PAIF Offshore Articles of Incorporation that removed both investors and indicated that a liquidating vehicle would be established to facilitate Ranger's redemption and withdrawal from the fund.

34. Following the declarations of the mandatory withdrawal, PAF continued to negotiate to try to resolve the issues with Ranger.

35. During these discussions between Ranger and PAF, we were put on the back burner in December 2016 when PAIF's largest finance company borrower, Argon Credit, filed a bankruptcy petition in the Bankruptcy Court for the Northern District of Illinois, placing approximately 60% of the assets in the PAIF fund at risk.

36. PAF subsequently determined that Argon Credit had committed fraud by, among other things, double pledging portions of its loan portfolio that served as collateral for the repayment of the line of credit that PAIF extended to Argon Credit. The Argon Credit estate is still in a Chapter 7 bankruptcy proceeding being administered by the United States Bankruptcy Court of the Northern District of Illinois (Case No. 16-39654). PAIF's subsidiary and an assignee of PAIF's rights, Fund Recovery Services, has obtained Court orders granting it stay relief to collect loan proceeds and apply such proceeds to reduce Fund Recovery Services' secured claim pending the administration of the Argon Credit case.

37. Following the Argon Credit bankruptcy filing, in April 2017, another of PAIF's finance company borrowers, Bristlecone Holdings and its affiliated companies (collectively,

"Bristlecone"), representing approximately 11% of the PAIF fund assets, filed a bankruptcy petition in the U.S. Bankruptcy Court for the District of Nevada (Lead Case No. 17-50472-BTB).[2]

38. By April 2017, approximately 70% of PAIF's assets were in bankruptcy estates. Nevertheless, PAF continued to try to reach agreement with Ranger to allow sufficient time for the redemption/withdrawal of Ranger's investments to occur in a manner that would not jeopardize the rights of the creditors and other investors, or reduce the value of PAIF's assets.

39. In June 2017, PAF provided Ranger with a plan for redemption and withdrawal of Ranger's interests. Ranger responded to this plan by initiating a JAMS arbitration proceeding and proceeded to go to the media to disparage the Debtors.

40. Ranger repeatedly sought orders from a JAMS arbitration panel that enjoined PAIF from continuing the orderly administration of its businesses. When injunctive relief failed, Ranger sought an alternative, non-arbitration forum for its quest and initiated litigation against affiliates and vendors of PAF in the Delaware Court of Chancery. PAF and PAIF ultimately obtained an anti-suit injunction against Ranger and the Delaware lawsuit was dismissed and refiled with JAMS.

41. PAIF has at all times maintained its intention to redeem Ranger's interests in PAIF in accordance with the proper redemption protocols. Ranger, however, is insistent that redemption must occur on its unilaterally established timeline and has resorted to litigation (against the Debtors and by attempting to usurp causes of action belonging to the Debtors) as a

---

[2] Although the Debtors obtained control over the Bristlecone leases that served as collateral for the Bristlecone line of credit, the servicing company for the leases has asserted a lien in the proceeds. The Debtors have initiated an adversary proceeding in the Nevada bankruptcy court to determine the extent, validity and priority of the alleged lien. That litigation is currently in discovery. The bankruptcy court has directed lease proceeds to be held in escrow pending determination of the adversary proceeding.

way to force the Debtors to accede to Ranger's demand that it own, direct and control all of the PAIF investments to the detriment of other limited partners.

B.   **Need for Bankruptcy Relief**

42.   While the arbitration was a significant factor in the timing of the filing of these Chapter 11 cases, it was not the sole reason for such filing. As discussed above, PAIF has substantial assets including ten (10) revolving credit lines[3] extended to regional and national finance companies. Several of these lines remain open and revolving while others have been defaulted and are the subject of litigations in different jurisdictions throughout the country. The Debtors are taking action on the collateral pledged to secure the defaulted loans and to pursue rights against related third-parties. Maximizing the recovery from these lines for the benefit of creditors and interest holders requires an orderly process, which includes administering the performing lines on an ongoing basis.

43.   One of the challenges which the Debtors have faced to date is that issues involving the defaulted lines have been the subject of litigation in various jurisdictions causing the Debtors to incur litigation expenses beyond those which would be present if some or all of the issues were addressed in a single forum. Thus, the Debtors intend, where appropriate, to remove to this Court some of those litigations.

44.   In addition, the JAMS arbitration has become a major distraction from the efforts of the Debtors to operate the business of PAIF and to maximize the benefits from that business for creditors and interest holders. The claims by Ranger in the JAMS arbitration are, with limited exception, claims against the Debtors or are derivative claims against principals of the Debtors and entities related to the Debtors.

---

[3] In total, PAIF acquired twelve (12) lines of credit from originators; two (2) of these revolving credit lines have since been satisfied.

45. As explained above, the Ranger entities are indirect or direct holders of limited partnership interest in the Debtor PAIF.

46. In anticipation of the Debtors' bankruptcy filing, PAF created an advisory board to attract independent individuals with skill sets to assist the Debtors through the Chapter 11 process, provide an independent view of the relevant financial information, and to assist and provide an independent oversight function for critical decisions required in the formation and implementation of a Chapter 11 plan. Bernard A. Katz of BAK Advisors, Inc. was appointed as the initial member of the advisory board.[4]

## FIRST DAY MOTIONS

**A.** **Motion for Joint Administration**

47. Many of the motions, applications, hearings and orders in these Chapter 11 Cases will jointly affect each Debtor. Under these circumstances, the interests of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes only.

48. Joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest, and will protect creditors of the respective estates against potential conflicts of interest.

49. For these reasons, the Debtors submit, and I believe, that the relief requested in the motion is in the best interest of the Debtors, their estates and their creditors, and, therefore, should be approved.

---

[4] PAF expects that the PAIF limited partners will take appropriate action pursuant to Delaware law: (i) to address any issues resulting from PAF, as PAIF's general partner, filing its own bankruptcy petition; and (ii) to enable PAIF to either reorganize or liquidate through an appropriate plan. In the meantime, and in the event the limited partners fail to act, PAF, has made express provision pursuant to the PAIF Limited Partnership Agreement by designating PAIF's officers to address the performance of its existing contracts and the preservation of its assets for the ultimate benefit of creditors and interest holders.

**B.    Motion to Continue Using Existing Cash Management System**

50.    In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System") involving twenty-five (25) bank accounts (collectively, the "Bank Accounts").  The Cash Management System provides a well-established mechanism for the collection, management and disbursement of funds used in the Debtors' business.

51.    In light of the well-established relationships between the Debtors, their banks and payment processors and the substantial size of the Debtors' operations, significant disruptions to the Debtors' business would be highly likely if the cash management procedures must be quickly altered. As such, it is essential that the Debtors be permitted to maintain their Cash Management System in its current format.

52.    Given the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, it would be difficult and unduly burdensome for the Debtors to establish an entirely new system of bank accounts and a new cash management and disbursement system. The Debtors, therefore, seek authority for the continued use of the Cash Management System and Bank Accounts. The Debtors further seek authority to implement ordinary course changes to their Cash Management System and to open and close bank accounts. The Debtors also request authority for the banks to charge and the Debtors to pay or honor service and other fees, costs, charges and expenses to which the banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors.

53.    The Debtors believe that the use of the bank accounts substantially complies with section 345(b) of the Bankruptcy Code. The Debtors seek a waiver of section 345(b) to permit them to continue to deposit funds in their bank accounts.

54. For these reasons, the Debtors submit, and I believe, that the relief requested in the motion is in the best interest of the Debtors, their estates and their creditors, and, therefore, should be approved.

## **CONCLUSION**

55. For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 12th day of March, 2018
in Princeton, New Jersey.

*[signature]* CEO
_____
John Cook