UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Benjamin Teich, Esquire
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Benjamin.Teich@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| Princeton Alternative Income | : | |
| Fund, LP et al., | : | Case No. 18-14603 (MBK) |
| | : | |
| Debtor(s) | : | Hearing Date: March 13, 2020 at 10:00 a.m. |
| | : | |

**OBJECTION OF THE UNITED STATES TRUSTEE TO
CONFIRMATION OF THE PLAN**

The United States Trustee (the "U.S Trustee"), by and through his counsel, and in furtherance of his duties pursuant to 28 U.S.C. §§ 586(a)(3) and (5), respectfully submits this objection (the "Objection") to confirmation of the proposed plan.

This Court has jurisdiction to hear the above-referenced Objection.

Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with the administrative oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes

beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898

F.2d 498, 500 (6 Cir. 1990) (describing the U.S. Trustee as a "watchdog").

Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard regarding the

above-referenced Objection.

## PRELIMINARY STATEMENT

The U.S. Trustee objects to the confirmation of this plan because if confirmed, it would:

(1) improperly eliminate the requirement that retained professionals and the chapter 11 trustee

file final fee applications; (2) provide exculpation to parties that are not eligible to receive

exculpation under Third Circuit caselaw; (3) improperly label a class of creditors as unimpaired

which avoids the scrutiny of 1129(b)(1)'s unfair discrimination inquiry and the absolute priority

rule; (4) improperly limit the discovery rights of third parties including the federal government;

(5) improperly limit the calculation and collection of statutory fees; and (6) improperly grant

overly broad releases.

## FACTS

I.    Background

1.  On March 9, 2018 (the "Petition Date"), Princeton Alternative Income Fund, LP

("PAIF") and  Princeton Alternative Funding, LLC ("PAF") (collectively the "Debtors") filed

voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

101 *et seq.* (the "Bankruptcy Code" or "Code").  *See* Docket 1.

2.  The U.S. Trustee has not appointed an official committee of unsecured creditors.

3.  On March 12, 2018, the Debtors filed a motion for joint administration of the PAIF

and PAF bankruptcies. *See* Docket 10. The Court entered an order jointly administrating the

cases on March 16, 2018 that designated PAIF the lead case.  *See* Docket 20.

2

4.  On May 23, 2018, the Debtor filed a motion for an order authorizing the Debtors'
retention and compensation of professionals utilized in the ordinary course of business. *See*
Docket 182.

5.  On June 15, 2018, the Court entered an order authorizing the Debtors' retention and
compensation of professionals utilized in the ordinary course of business (the "OCP Order"). *See*
Docket 222. Paragraph 2g of the OCP Order states: "All Ordinary Course Professionals will file
a final fee application pursuant to 11 U.S.C. § 330 covering the period from the effective date of
retention through the conclusion of the engagement."  *Id*. at ¶ 2g.

6. In November 2018, Matthew Cantor was appointed as the chapter 11 trustee (the
"Trustee"). *See* Docket 389.

7.  On November 11, 2018, the Trustee filed an application to employ Wollmuth Maher
& Deutsch LLP ("WMD") as his bankruptcy counsel. *See* Docket 424.

8.  On December 19, 2019, the Court entered an order approving the retention of WMD
(the "WMD Retention Order"). *See* Docket 474. Paragraph 3 of the WMD Retention Order
requires compensation for WMD's professional services to be "fixed by the Court upon
appropriate application . . . in accordance with sections 330 and 331 of the Bankruptcy Code and
such Bankruptcy Rules and Local Rules of Bankruptcy Procedure as may then be applicable." *Id*.
at ¶3.

9.  On December 20, 2018, the Trustee filed an application to employ TRS Advisors,
LLC ("TRS") as Financial Advisor and Investment Banker. *See* Docket 475.

10.  On February 8, 2019, the Court entered an order approving the retention of TRS as
financial advisor and investment banker (the "TRS Retention Order"). Paragraph 4 of the TRS
Retention Order states "TRS shall file fee applications for interim and final allowance of

compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the guidelines for the U.S. Trustee, and any applicable orders of this Court . . ." *Id*. at ¶4. Paragraph 4 of the TRS Retention Order goes on to set the standard of review for TRS's compensation as that set forth in section 328 of the Bankruptcy Code. *Id*. However, paragraph 5 of the TRS Retention Order states that U.S. Trustee shall have the right to object to TRS's compensation based on the reasonableness standard provided in section 330 of the Bankruptcy Code. *Id*. at ¶ 5.

11.  On January 11, 2019, the Trustee filed an application to employ McGlinchey Stafford PLLC ("McGlinchey") as special counsel. *See* Docket 493.

12.  On January 22, 2019, the Court entered an order approving the retention of McGlinchey as special counsel to the Trustee (the "McGlinchey Retention Order"). *See* Docket 493. Paragraph 3 of the McGlinchey Retention Order requires compensation for McGlinchey's professional services to be "fixed by the Court upon appropriate application . . . in accordance with sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules and Local Rules of Bankruptcy Procedure as may then be applicable." *Id*. at ¶3.

13.  On March 12, 2019, the Trustee filed an application to retain Ogier as special counsel. *See* Docket 588.

14.  On March 22, 2019, the Court entered an order approving Ogier's retention as special counsel (the "Ogier Retention Order"). Paragraph 3 of the Ogier Retention Order requires compensation for Ogier's professional services to be "fixed by the Court upon appropriate application . . . in accordance with sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules and Local Rules of Bankruptcy Procedure as may then be applicable." *Id*. at ¶3.

4

15.   On June 27, 2019, the Trustee filed an application to retain Citrin Cooperman & Company, LLP ("Citrin") as his accountant. *See* Docket 706.

16.   On July 12, 2019, the Court entered an order approving the Trustee's retention of Citrin (the "Citrin Retention Order"). *See* Docket 721. Paragraph 3 of the Citrin Retention Order requires compensation for Citrin's professional services to be "fixed by the Court upon appropriate application . . . in accordance with sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules and Local Rules of Bankruptcy Procedure as may then be applicable." *Id.* at ¶3.

17.   On February 19, 2020, the Trustee filed several documents: (1) a notice of proposed settlement (the "Global Settlement"), Docket 1095; (2) an amended disclosure statement (the "Disclosure Statement"), Docket 1098; (3) an amended plan (the "Plan"), Docket 1097; and (4) a motion to approve the Global Settlement and confirm the Plan (the "Motion"), Docket 1096.

II.      Fee Applications Under the Plan

18.   The Disclosure Statement and Plan state that none of the retained professionals – WMD, TRS, McGlinchey, Ogier and Citrin (collectively the "Retained Professionals") will be required to file fee applications. *See* Disclosure Statement, Docket 1098 at 32 of 48[1] (III.B.2)[2] and Plan, Docket 1097, 27 of 30 (11.14).[3]

19.   The Disclosure Statement and Plan also make clear that the Trustee will not be required to file a fee application. *Id.*

---

[1] This is the "ECF pagination" that the Court affixes to the file document available electronically on CM/ECF and PACER. The remainder of the page citations will also be to the ECF pagination.
[2] This references the Article and Section of the Disclosure Statement.
[3] This references the Article and Section of the Plan.

III.    The Exculpation Provision in the Plan and the Defined Terms in the Plan
Necessary to Understand Such Provision

20. The Plan contains the following exculpation provision: "none of the Exculpated

Parties shall have or incur any liability to any holder of a Claim or Equity Interest for any act or

omission in connection with, related to, or arising out of, the Case, the pursuit of confirmation of

the Plan, the consummation of the Plan or the administration of the Plan or the property to be

distributed under the Plan, except for willful misconduct and gross negligence, and, in all

respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect

to their duties and responsibilities under the Plan."  Docket 1097, page 25 of 30 (10.04.1).

21.  To understand the exculpation provision, one must trace through the defined terms of

the Plan.

22.  The Plan defines "Exculpated Parties as "the Trustee, his Related Parties, the

Trustee's Professionals, the Ranger Entities, Covenant, the MicroBilt Group, the Ad Hoc

Committee, all Investors, the Feeder Fund directors, and all of their Professionals and Related

Parties." *Id*. at 11 of 30 (Article 1).

23.  The Plan defines "Related Parties" as "collectively, current and former Affiliates of

such Entity, and such Entity's Affiliates predecessors, successors, and assigns, subsidiaries,

parents, managed accounts or funds, current and former directors, principals, managers, officers,

and direct and indirect equity holders, employees, financial and legal advisors, accountants,

representatives, and other professionals."  *Id*. at 14 of 30 (Article 1). Except Related Parties does

not include "the Ranger Entities, the MicroBilt Group, all Investors, the Trustee, the Trustee

Professionals, the Debtors and the Feeder Fund." *See Id*. and *Id*. at 11 of 30.

6

24.  The Plan defines "Entity" as having the same meaning as that set forth in section 101(5) of the Bankruptcy Code. *Id*. at 10 of 30 (Article 1).

25.  The Plan defines "Affiliates" as "a Person controlled by, controlling, or under common control or ownership with, any other Person." *Id*. at 8 of 30 (Article 1).

26.  The Plan defines "Person" as "any individual, partnership, corporation, trust, governmental unit, Entity or organization of any type whatsoever."  *Id*. at 13 of 30 (Article 1).

27.  The Plan defines the "Trustee Professionals" as WMD, TRS, McGlinchey, Sheridan Asset Management, LLC, Citrin, and Ogier. *Id*. at 15 of 30 (Article 1).

28.  The Plan defines the "Ranger Entities" as "Ranger Management, Ranger Offshore, Ranger Onshore, and their affiliates, as defined as the Ranger Entities in the PSA." *Id*. at 14 of 30 (Article 1).

29.  The Plan defines "Covenant" as "Covenant Strategic Income Fund Series Interests of the SALI Multi-Series Fund II 3(c)(1), LP." *Id*. at 10 of 30 (Article 1).

30.  The Plan defines the "Microbilt Group" as "individually and collectively, Princeton Alternative Funding Management, LLC, MicroBilt, MicroBilt Financial Services Corporation, Rosebud Management, LLC, AFAB International, Ltd, AFAB International, LLC, Westminster National Capital Co., LLC, Bristol Investments, Ltd, Bristol Investments, LLC, Philip N. Burgess, Jr, Walter Wojciechowski, John "Jack" Cook, HP Funding II LLC, LJP Consulting, LLC, Alonzo Primus and all their past and present directors, parent entities, controlling persons, associates, predecessors, successors, affiliates, or subsidiaries, past and present officers, directors, employees, stockholders, officials, members, principals, agents, representatives, attorneys, advisors predecessors, successors, and assigns." *Id*. at 12 of 30 (Article 1).

7

31.  The Plan defines the "Ad Hoc Committee" as "the unofficial ad hoc committee of Investors identified on the Verified Statement Pursuant to Federal Rule of Bankruptcy Procedure 2019 [Doc. No. 754], and all of such Investors' past and present directors, parent entities, controlling persons, associates, predecessors, successors, affiliates, or subsidiaries, past and present officers, directors, employees, stockholders, officials, members, principals, agents, representatives, attorneys, advisors, predecessors, successors, and assigns and any other party related to or controlled by the foregoing." *Id*. at 7 of 30 (Article 1).

32.  The Plan defines an "Investor" as a "Holder of a Limited Partner Interest in PAIF or the Feeder Fund." *Id*. at 12 of 30 (Article 1).

33.  The Plan defines "Holder" as "any Entity holding a Claim or Interest, and includes the beneficial Holder of such Claim or Interest." *Id*. at 12 of 30 (Article 1).

34.  The Plan defines "Claim" as "a 'claim' within the meaning of section 101(5) of the Bankruptcy Code. *Id*. at 9 of 30 (Article 1).

35.  The Plan defines "Interest" as "the rights afforded to the Holder of an Equity Interest in either of the Debtors." *Id*. at 12 of 30 (Article 1).

36.  The Plan defines "Equity Interest" as "all outstanding partnership, membership, equity, or other ownership interests in any of the Debtors, including any Interest evidenced by stock, membership, partnership, warrants, options or other rights to purchase or receive any ownership Interest in any of the Debtors, or any right to payment or compensation based on such Interest."  *Id*. at 10 of 30 (Article 1).

37.  The Plan defines "Limited Partner" as "the Holder of a Limited Partner Interest in PAIF, including Investors in the Feeder Fund." *Id*. at 12 of 30 (Article 1).

8

38.  The Plan defines the "Feeder Fund" as "Princeton Alternative Income Offshore Fund, Ltd." *Id*. at 11 of 30 (Article 1).

39.  The Plan does not define "Professionals" in Article 1 of the Plan.

IV.    <u>Impairment of Classes Under the Plan</u>

40.  In total, the Plan contains eleven classes (7 PAIF Classes and 4 PAF Classes). *Id*. at 18 of 30 (4.01-4.02).

41.  Under the Plan, the Allowed Priority Claims of both PAIF and PAF (PAIF Class 1 and PAF Class 1) will be paid in full on the Effective Date and are thus unimpaired. *Id*.

42.  The Ranger Entities claims against PAIF and PAF (PAIF Class 3 and PAF Class 3) and Covenant's claim against PAIF (PAIF Class 4) are being treated in accordance with the Plan Support Agreement. *Id*. The Ranger Entities and Covenant will be paid but are not being paid in full. Therefore, all these classes are impaired. The Ranger Entities and Covenant have consented to their respective treatment under the Plan.

43. The legal, equitable, and contractual rights in intercompany claims that PAF and the Feeder Fund have against PAIF are remaining unaltered (PAIF Class 5). *Id*. The Plan states this class is unimpaired. *Id*. The Plan does not state if PAIF holds any claims against PAF for the Feeder Fund and if so, in what class those claims are classified.

44.  The legal, equitable, and contractual rights of the general partner in PAIF are remaining unaltered (PAIF Class 6). *Id*. The Plan states this class is unimpaired. *Id*.

45.  It isn't clear what will happen to the limited partner interests in PAIF. It appears that PAIF Class 7 may include the class of limited partnership interests in PAIF, but it isn't clear because the Plan describes the treatment of the claims in PAIF class 7, but does not state what claims make up PAIF Class 7: "Members of this Class shall retain their interests in PAIF (or the

Feeder Fund, as the case may be), and shall be treated in accordance with the PSA." *Id*.

Assuming PAIF Class 7 is the limited partnership interests in PAIF, holders of interests in this

class will be treated in accordance with the PSA. *Id*.

46.  The legal, equitable, and contractual rights of the allowed general unsecured claims

against PAIF (PAIF Class 2) are remaining unaltered (except for two claims that were scheduled

as disputed and for which no proof of claim was filed). The Plan states this class is unimpaired.

*Id*.

V.      Bar on Third Party Discovery

47.  The Plan proposes to bar "all Persons and Entities" from "issuing or serving" any

formal or informal discovery related to the bankruptcy cases to/on the "Trustee Professionals"

(the "Discovery Bar").

48.  The Discovery Bar is broad and extends well past the parties to the PSA or those

who have appeared in the case. As described above, the Plan defines Persons as "any individual,

partnership, corporation, trust, governmental unit, Entity or organization of any type

whatsoever."  Therefore, the proposed discovery bar includes all federal and state government

agencies.

VI.     Releases in the Plan

49.  The Plan contains the following release provision: "As of the Effective Date, and

without the need for taking of any further action, each of the parties to the PSA shall be deemed

to have released one another with respect to all Released Claims in accordance with the terms of

the PSA."

50.  The term "parties" is not defined in the Plan, but the attached PSA defines "Parties"

as the "the Trustee, the Trustee's Professionals, the Debtors, the Ranger Entities, Covenant, the

members of the MicroBilt Group, the Ad Hoc Committee, each of its members, and all

Investors." *See* Docket 1097-1, 5 of 73, ¶ 30.

51.   The PSA defines the terms Trustee, Trustee's Professionals,[4] the Ranger Entities,

Covenant, the MicroBilt Group, the Ad Hoc Committee, and Investors similarly to how those

terms are defined in the Plan. *Compare* Docket 1097 (Article 1) with Docket 1097-1, ("Defined

Terms").

## **LEGAL ANALYSIS**

I.      <u>Burden is on the Plan Proponents to Prove the Plan is Confirmable</u>

52.   Confirmation of a chapter 11 plan requires that the Debtor meet all the requirements

of Section 1129(a). *See In re Chadda*, 2007 WL 3407375 *4 (Bankr. E.D.Pa. Nov. 9, 2007). *See*

*also Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-221 (Bankr. D.N.J. 2000).

II.     <u>The Plan Cannot Be Confirmed Because It Impermissibly Waives the
Requirement that Retained Professionals and the Chapter 11 Trustee File Final
Fee Applications</u>

A.   The Bankruptcy Code Requires Retained Professionals to Apply for
Compensation and Have it Approved

53.   Pursuant to Federal Rule of Bankruptcy Procedure 2016(a), an attorney seeking

compensation must "file an application setting forth a detailed statement of (1) the services

rendered time expended and expenses incurred, and (2) the amounts requested." *See* Fed. R.

Bankr. P. 2016(a).

54.   11 U.S.C. § 330(a)(1) provides that after notice and a hearing, the court may award

to a professional person employed under 11 U.S.C. § 327 "reasonable compensation for actual,

necessary services rendered" by such a professional person. 11 U.S.C. § 330(a)(1).

---

[4] Note that the PSA uses the possessive: "Trustee's Professionals" whereas the Plan uses "Trustee Professionals."

55.  Professional fees may not be awarded unless and until the applicant shows that there

is a benefit to the estate. *See* 11 U.S.C. § 330(a)(4)(A)(ii). Showing a benefit to the estate and

necessity of the fees are the critical threshold issues before the court may award any

compensation. *See* 11 U.S.C. § 330(a)(4)(A)(ii*). See also In re Lederman Enterprises*, 997 F.2d

1321, 1322-23 (10th Cir. 1993) (holding that the disallowance of fees for services which were

not necessary or beneficial to the estate should not be considered a penalty but rather a statutory

imperative).

56.  The burden rests squarely with the party seeking compensation to prove that the

compensation and expenses sought were reasonable and necessary. *Zolfo, Cooper & Co. v.

Sunbeam- Oster Co*., Inc., 50 F.3d 253, 260 (3d Cir. 1995); *In re Engel*, 124 F.3d 567, 573 (3d

Cir. 1997) (*citing In re Ark. Co.*, 798 F.2d 645, 650 (3d Cir. 1986) (other citation omitted));

*Johnson v. Holiday Express Inc.*, 488 F.2d 714 (6th Cir. 1974).

57.  In analyzing whether a movant has satisfied its burden for approval of compensation,

a bankruptcy court should evaluate the "two-tier[ed] test for determining whether and in what

amount to compensate professionals. . . [f]irst, the court must be satisfied that the professionals

performed actual and necessary services. . . [s]econd, the court must assess a reasonable value

for those services." *In re Channel Master Holdings, Inc.*, 309 B.R. 855, 861 (Bankr. Del.

2004) (internal quotation omitted). *See also In re Fleming Companies, Inc.*, 304 B.R. 85, 90

(Bankr. Del. 2003).

58.  In assessing the reasonableness of compensation, § 330 of the Bankruptcy Code sets

forth a list of six (6) non-exclusive factors that are to be considered. These factors focus on the

nature, extent, and value of the services provided by the professionals at the time incurred. The

factors include:

12

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy filed; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title

11 U.S.C. § 330(a)(3). *See also In re Northwest Airlines Corp.*, 400 B.R. 393, 398 (Bankr. S.D.N.Y. 2009).

59.   The bankruptcy court has the power and the duty to review fee applications, even absent any objections. *In re Busy Beaver Bldg Centers, Inc.*, 19 F.3d 833, 841 (3d Cir. 1995).

60.   Waiver of the requirement to file final fee applications deprives the Court of the information necessary to fulfill its duty to review professional fees and curtails the Court's ability to award fees consistent with § 330. It also deprives the U.S. Trustee and other parties in interest from objecting to the amount of fees based on the reasonableness of those fees.

61.   Only full fee applications with detailed time records meet the professionals' burden of providing detailed descriptions of legal fees and expenses under Bankruptcy Rule 2016(a). In addition, detailed time entries are the only way for a professional to carry his or her burden to

show the compensation requested is reasonable for the services provided. Failure to provide this information makes it impossible for the Court to perform the reasonableness assessment mandated by § 330.

62.    Compensation of a chapter 11 trustee is very similar to that of a professional retained pursuant to section 327(a). Like a 327(a) professional, the "court may allow reasonable compensation under section 330" to be paid to a chapter 11 trustee. However, in addition to the reasonableness restrictions of section 330, a chapter 11 trustee's compensation is capped by section 326. *See* 11 U.S.C. § 326(a) (capping a trustee's compensation for services to the outcome of a formula based on percentages of monies disbursed by the trustee); *In re Marvel Entm't Grp.*, 234 B.R. 21, 39 (D. Del. 1999) citing *In the Matter of Gulph Woods Corporation*, 150 B.R. 603 (E. D. Pa. 1993); and *In re LAN Associates XI, LLP.*, 237 B.R. 49, 1998 WL 467100 (D.N.J. 1998).

63.    Provisions of the Plan propose to absolve the Retained Professionals and Trustee from filing fee applications, despite the requirements for fee applications supported by statutory, regulatory, and case law cited above.

64.    The relief provided by a confirmed bankruptcy plan can be extensive, but a plan is not able to circumvent provisions of the Bankruptcy Code. "The Court shall confirm a plan *only if* . . . The plan complies with applicable provisions of this title." 11 U.S.C. § 1129(a) (emphasis added).

      B.  This Court has Already Ordered the Retained Professionals to File Final Fee Applications

65.    The WMD Retention Order, the TRS Retention Order, the McGlinchey Retention Order, the Ogier Retention Order, and the Citrin Retention Order all require that the

professionals retained pursuant to those orders file final fee applications. The OCP Order also

requires a final fee application for any professional retained pursuant to that order.

66.  All of those orders were entered over six months ago. None of those orders are on

appeal and all of them are final. *See Staiano v. Pillowtex, Inc. (In re Pillowtex, Inc.)*, 304 F.3d

246, 250 (3d Cir. 2002) (A determination of a debtor's application for retention of counsel is a

final order, which the appellate court has jurisdiction to review).

67.  The need for the Retained Professionals to file final fee applications if they wish to

be paid for the services they provided has already been determined and is the law of the case.

The Retained Professionals (and other parties) are collaterally estopped from relitigating the need

for final fee applications. *See Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 214 (3d Cir.

1997) (for collateral estoppel to apply, the following elements must be present: "(1) the issue

sought to be precluded must be the same as the one involved in the prior action; (2) the issue

must have been actually litigated; (3) the issue must have been determined by a valid and final

judgment; and (4) the determination must have been essential to the prior judgment").

III.    The Plan Cannot Be Confirmed Because It Exculpates Parties that Do Not Qualify
        for Exculpation

68.  In *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)*,* the Third Circuit

addressed exculpation of a creditors' committee and its members, and the officers, directors,

employees, advisors, professionals and agents of the same, holding that such exculpation was

permissible because the standard of liability contained in the exculpation clause was "the

standard that already applies in this situation [and therefore] affects no change in liability."

*PWS*, 228 F.3d at 246.

69.  The Third Circuit pointed to interpretations of section 1103(c) to support its finding:

15

1103(c) "has been interpreted to imply both a fiduciary duty to committee constituents and a

limited grant of immunity to committee members." *Id.* at 246.

70. "This immunity," the court found, "covers committee members for actions within the

scope of their duties." *Id*. Such immunity, however, cannot extend to willful misconduct or

"*ultra vires*" acts, which has been interpreted to mean gross negligence. *Id.; see Washington

Mutual*, 442 B.R. 314, 348 (Bankr. D. Del. 2011) *citing PWS*, 228 F.3d at 246.

71. Only estate fiduciaries can be exculpated for actions or inactions that take place

during the bankruptcy case, and actions that are willful misconduct or gross negligence must be

excluded from any exculpation. *See Washington Mutual,* 442 B.R. at 350-51 (an "exculpation

clause must be limited to the fiduciaries who have served during the chapter 11 proceeding:

estate professionals, the Committees and their members, and the Debtors' directors and

officers"); *Tribune,* 464 B.R. 126, 189 (Bankr. D. Del. 2011) (agreeing with *Washington

Mutual*); *Indianapolis Downs,* 486 B.R. 286 (Bankr. D. Del. 2013) (following *Washington

Mutual)*; *see also In re S. Canaan Cellular Investments, Inc.*, 427 B.R. 44, 84 (Bankr. E.D. Pa.

2010); and *Congoleum Corp.*, 362 B.R. 167, 196 (Bankr. D.N.J. 2006).

72. The Plan's exculpation clause provides exculpation to a myriad of people and entities

and goes far beyond the estate fiduciaries allowed under *PWS*. This is most obviously illustrated

by the breadth of the Plan defined term "Related Parties"[5] and the inclusion of the "Related

Parties" of the Trustee, the Trustee's professionals, the "Ranger Entities," "Covenant," the

"Microbilt Group," the "Ad Hoc Committee," all "Investors," and the "Feeder Fund" directors,

---

[5] Related Parties includes "current and former Affiliates of such Entity, and such Entity's Affiliates predecessors, successors, and assigns, subsidiaries, parents, managed accounts or funds, current and former directors, principals, managers, officers, and direct and indirect equity holders, employees, financial and legal advisors, accountants, representatives, and other professionals."

in the exculpation clause.[6]

73. If the Plan is confirmed, the U.S. Trustee requests that the exculpation provision be

struck or be properly modified to comply with Third Circuit precedent by limiting those persons

or entities receiving exculpation to those who are estate fiduciaries; and by limiting the

exculpation to actions or inactions that take place during the bankruptcy case that are not due to

gross negligence or willful misconduct.

IV.    <u>PAIF Class 2 is Impaired and Therefore the Plan can Only be Confirmed if it
Proceeds Through 1129(b)</u>

A.  PAIF Class 2 is Impaired

74. Through the treatment of claims in PAIF Classes 6 and 7, the Plan is reinstating

equity interests of PAIF.

75. However, the general unsecured creditors of PAIF (PAIF Class 2) are not being paid

through the Plan. Instead, the PAIF Class 2 claims are "riding through" and the PAIF Class 2

claimants will have the ability to avail themselves of whatever rights or interests they held before

the bankruptcy was filed. The Plan erroneously labels PAIF Class 2 as unimpaired.

76. The "ride-through" of the PAIF Class 2 claims is analogous to the facts of *In re

Smith*, 123 B.R. 863 (Bankr. C.D. Cal. 1991). In *Smith*, the plan proposed to allow one claim

(that of the Rieffanaughs) to "ride through" the plan and the plan labeled the claim unimpaired.

*In re Smith*, 123 B.R. at 866 ("The Debtor reasons that she is leaving the Rieffanaughs with

precisely what they had when this bankruptcy case commenced, and that therefore, the requites

of § 1124(1) are satisfied").

77. The Court in *Smith* rejected this argument explaining the flaw in the Debtor's

---

[6] Terms inside quotation marks in this paragraph are defined terms under the Plan.

reasoning:

> Implicit in the Debtor's argument is her conclusion that the Rieffanaughs' claim entitles them to no rights except the "right" to seek redress in another court after confirmation of her plan. That theory ignores the rights afforded the Rieffanaughs by the Bankruptcy Code itself *i.e.*, the right to have the validity and extent of their claim determined by this court; and *the further right to receive property or payment equal to the allowed amount of their claim to the extent there are assets in the bankruptcy estate from which payment can be made.*

*In re Smith*, 123 B.R. at 866 (emphasis added).

### B.  Consequences of the Impairment of PAIF Class 2

78.  All classes that are impaired and have not voted in favor of the Plan must be "crammed down" pursuant to section 1129(b).[7] 11 U.S.C. § 1129(b).

79.  Section 1129(b) requires that the Court find that the Plan: (1) does not unfairly discriminate against each class of claims or interests that are impaired under the plan and has not accepted the plan; and (2) is fair and equitable. *See* 11 U.S.C. § 1129(b)(1). It is the plan proponents' burden to provide the Court evidence to support both of these findings under 1129(b)(1).

80.  Pursuant to section 1129(b)(2), "fair and equitable" includes the following pertinent requirements:

> **(B)** With respect to a class of unsecured claims—
> **(i)** the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> **(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

---

[7] Alternatively, the plan proponents could delay the confirmation hearing and solicit votes from PAIF Class 2 members to see if sufficient votes can be collected to cause PAIF Class 2 to be an impaired consenting class.

**(C)** With respect to a class of interests—
**(i)** the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
**(ii)** the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(B-C).

81.   Section 1129(b)(2) is sometimes called the "absolute priority rule" because it requires that that lower priority claimants receive nothing until higher priority claimants have received property of a value to fully satisfy their allowed claims.

82.   PAIF Class 2, the general unsecured claims of PAIF, is impaired because it not being paid in full while a lower priority classes, PAIF Classes 6 and 7,[8] the equity of PAIF, are retaining their interests *and* PAIF Class 2 has not voted to accept the Plan. This same analysis also applies to PAIF Class 5, the intercompany claims of PAF and the Feeder Fund against PAIF. The Plan already properly lists PAF Class 4 as impaired and states that it is deemed to reject the Plan.

83.   In this case, the plan proponents must provide evidence that PAIF Class 2 claims, and PAIF Class 5 claims, are not being unfairly discriminated against and that the treatment of those claims is fair and equitable because those are the classes of claims that are impaired (despite the Plan labeling these classes as unimpaired) and have not voted in favor of the Plan.

84.   Currently, the plan proponents have not provided any evidence sufficient for the Court to make a finding that the Plan does not unfairly discriminate against PAIF Class 2 claimants.

---

[8] Oddly, PAIF Classes 6 and 7 are both having their equity interests reinstated, but the Plan lists PAIF Class 6 as unimpaired and PAIF Class 7 as being impaired.

85.  Similarly, the Plan does not conform to the absolute priority rule because the PAIF

Class 2 claimants, who are unsecured creditors of PAIF, are not receiving full payment on their

claims, but PAIF Class 7 is retaining equity in PAIF.

V.    The Plan Contains an Impermissible Discovery Bar Against Third Parties and the
       Federal Government

86.  The Motion contains a single string citation to support the idea that courts allow

discovery bars similar to the Discovery Bar in the Plan. *See* Docket 1096-1, ¶ 28. The string

citation contains one published opinion – *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 435

(S.D.N.Y. 1993)*;* and three unpublished citations from the Bankruptcy Court for the District of

Delaware - *In re Washington Mut., Inc.*, Case No. 08-12229, Doc. No. 10235 (Bankr. D. Del.

May 30, 2012); *In re Tribune, Co.*, Case No. 08-13141 (Bankr. D. Del. August 26, 2010); and *In

re DBSI, Inc.*, Case No. 08-12687 (Bankr. D. Del. Nov. 24, 2009).

87.  It is clear from the scant case law that discovery bars are not a common form of

relief.

88.  None of the cases cited by the Motion in support of the Discovery Bar is analogous

to the situation before the Court today.

89.  In *In re Ionosphere*, a set of protective orders were signed by several parties to

facilitate and hasten the informal discovery of the court-appointed examiner. *In re Ionosphere

Clubs, Inc.*, 156 B.R. 422. All materials protected by the protective order were "made available

to all parties to the proceeding under the Protective Orders." *Id*. After the examiner filed his

final report, certain parties to the protective orders (and certain news organizations) sought to

vacate the protective orders, and the Court reserved decision on this matter. *Id*. at 423. After a

settlement agreement was reached in the case, the motion to release all investigative materials

used by the examiner to formulate his report released, and the Bankruptcy Court denied that

motion. *Id*. at 424-25. This denial was then appealed to the District Court, which upheld the

denial in a section titled "The Public Right to Discovery Records."  The District Court's ruling

had two bases: (1) as the Bankruptcy Court had found, a voluntary party to a protective order

should be prevented from later objecting to the protective orders strictures, otherwise, no-one

would agree to protective orders; and (2) almost all of the information collected by the examiner

was not done through civil discovery, but under the broader auspices of Bankruptcy Rule 2004.

*Id*. at 432. The court stated that the importance of the second prong is that third parties subject to

a Rule 2004 investigation have a greater interest in protecting their privacy than litigants engaged

in discovery under Rule 26 because the broader scope of Rule 2004 has the ability to include

parties more attenuated to the debtor or a dispute. *Id*.

90. In this case, much of the discovery was done pursuant to the civil discovery rules and

was done amongst the parties. Further, this is not a situation where this Court is being asked via

motions practice to overturn the status quo - a protective order that was entered to aid an

examiner in the speed and ease of his task. Also, this case does not contain the first basis of the

*Ionosphere* Court's ruling that a party to a protective order should not be able to reverse its

position when it suits them.

91.  The document cited in the Motion from *In re Washington Mutual* is an order that

provides an examiner a third-party discovery bar that specifically carves out any "requests for

documents that the third party demonstrates it cannot obtain from any other source as long as

such production" does not violate another order of the Court or seek privileged materials. *In re*

*Washington Mut., Inc.*, Case No. 08-12229, Doc. No. 10235, ¶ 4 (Bankr. D. Del. May 30, 2012).

This order was granted by the Bankruptcy Court for the District of Delaware on notice and

motion by the examiner seeking the relief. The order was not granted pursuant to confirmation of

a plan. Notably absent from the Motion and from this document is any context about why such a

discovery bar was appropriate. The plan proponents have not provided sufficient evidence or

argument as to how the circumstances of *In re Washington Mutual*, provide a basis for granting

the Discovery Bar.

92. The Motion does not cite to a particular document in *In re Tribune, Co.*, but based on

the date provided in the citation, the Motion may be referring to an order granting a motion on

notice by the examiner in that case. *In re Tribune, Co.*, Case No. 08-13141, Doc. No. 5541

(Bankr. D. Del. August 26, 2010). This order requires the examiner in that case to maintain

records for two years and limits the discovery bar by allowing discovery that cannot be obtained

from another source, discovery in a criminal case pursuant to *Brady v. Maryland*, 373 U.S. 83

(1963), and discovery concerning the compensation of the examiner and his professionals. *Id*. at

¶¶ 4 and 7. Again, absent from the Motion and from this cited document is any context about

why such a discovery bar was appropriate. This order was granted on a motion, not through a

plan confirmation and it involved an examiner not a chapter 11 trustee. The plan proponents have

not provided sufficient evidence or argument as to how the circumstances of *In re Tribune Co.*,

provide a basis for granting the Discovery Bar.

93.  The Motion does not cite to a particular document in *In re DBSI*, but based on the

date provided in the citation, the Motion may be referring to an order approving a settlement in

that case. *In re DBSI, Inc.*, Case No. 08-12687, Doc. 4928 (Bankr. D. Del. Nov. 24, 2009). This

order does not specifically say anything regarding a discovery bar. The plan proponents have not

provided any evidence or argument as to how *In re DBSI* provides a basis for granting the

Discovery Bar.

VI.     <u>The Plan Impinges on the Calculation and Collection of Quarterly Fees</u>

94.   Quarterly fees are required to be paid in cases under chapter 11 of title 11 pursuant to

28 U.S.C. § 1930(a)(6).

95.   All quarterly fees outstanding must be paid on or before the effective date of the Plan

pursuant to U.S.C. § 1129(a)(12).

96.   It is part of the duties of the U.S. Trustee to take actions to ensure the proper and

timely calculation and collection of quarterly fees pursuant to 28 U.S.C. § 586(a)(3)(D).

97. To the extent any provision of the Plan attempts to limit the application or effects of

the following statutory provisions: 28 U.S.C. § 1930(a)(6); 28 U.S.C. § 586(a)(3)(D); or 11

U.S.C. § 1129(a)(12), the U.S. Trustee objects and requests that any such Plan provision be

stricken or the confirmation of the Plan be denied.[9]

98.   The U.S. Trustee further reserves all rights, including, but not limited to his right to

file a motion to reopen this case and seek to have the confirmation order vacated for failure of

the Debtors to pay all outstanding quarterly fees by the effective date of the Plan.

VII.    <u>The Plan Contains Overly Broad Releases</u>

99.   The Plan contains releases that purports to be bilateral and not include any third

parties: "As of the Effective Date, and without the need for taking of any further action, each of

the parties to the PSA shall be deemed to have released one another with respect to all Released

---

[9] The following is a non-comprehensive list of instances where trustee fees are mentioned or implied by the Plan or the PSA:

Plan = 1; 2.01; 2.02; 2.03; 2.07; 6.01; 11.12; and

PSA = Defined Term 2; Defined Term 42; General Terms 2(b); Schedule 2.

It is unclear if the Plan or PSA limit the above statutory provisions. For instance, Section 2.03 of the Plan states the United States Trustee Fees for the first calendar quarter of 2020 will be paid in full from the Escrow Amount. However, the Escrow Amount will not be paid into escrow until after the closing of the case, which occurs after the Effective Date. Contrast this with Plan Section 11.12 that states all trustee fees will be paid "no later than the effective date."

Claims in accordance with the terms of the PSA" (the "Release Provision").

100.  The term "parties" is not defined in the Plan, but the attached PSA defines "Parties"
as the "the Trustee, the Trustee's Professionals, the Debtors, the Ranger Entities, Covenant, the
members of the MicroBilt Group, the Ad Hoc Committee, each of its members, and all
Investors."  *See* Docket 1097-1, 5 of 73, ¶ 30.

101.  The PSA defines the terms Trustee, Trustee's Professionals, the Ranger Entities,
Covenant, the MicroBilt Group, the Ad Hoc Committee, and Investors similarly to how those
terms are defined in the Plan. *Compare* Docket 1097 (Article 1) with Docket 1097-1, ("Defined
Terms").

102.  It is unclear which set of definitions would control in the Release Provision, but
regardless, the defined terms in the release provision cause the releases to extend beyond the
signatories to the PSA or entities that those signatories directly control. Therefore, the Release
Provision is disguising some non-consensual, third-party releases.

103.  Releases of non-debtors' claims held by other non-debtors effectuated through a
bankruptcy plan are evaluated based on the Third Circuit's opinion in *Gillman v. Continental
Airlines (In re Continental Airlines),* 203 F.3d 203 (3d Cir. 2000) ("*Continental*").

104.    In *Continental*, the Third Circuit surveyed cases from various circuits as to
determine when, if ever, a non-consensual third-party release is permissible. The Court
acknowledged that a number of Circuits do not allow such non-consensual releases under any
circumstances.  *See id*. at 212. Other Circuits, the Court found, "have adopted a more flexible
approach, albeit in the context of extraordinary cases," such as mass tort cases. *See id. citing
Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. ( In re Drexel
Burnham Lambert Group, Inc.),* 960 F.2d 285, 293 (2d Cir. 1992); *Kane v. Johns-Manville Corp.*

24

*(In re Johns-Manville Corp.)*, 843 F.2d 636, 640, 649 (2d Cir. 1988). *See also*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (third party release may be granted "only in rare cases").

105.    In the rare or extraordinary case when non-consensual releases are permissible, the Third Circuit held that a Court would still need to find specific facts to support that the proposed non-consensual releases in a plan possess the "hallmarks of permissible non-consensual releases" – "fairness" and "necessity to the reorganization." *Id.* at 214.

106.  The U.S. Trustee objects to the confirmation of the Plan unless the Release Provisions are struck or modified to eliminate all non-consensual third-party releases contained therein. This case is not an extraordinary case like a mass tort case and therefore the Court should not reach the application of *Continental*.

107.  Even if the Court reaches the *Continental* analysis, the plan proponents have not provided any evidence that the portions of the Release Provision that are non-consensual third-party releases meet the standards of *Continental*.

108.  The U.S. Trustee asserts that if the Court confirms the Plan, the issues with the Release Provision could be cured with the insertion of the following language in the confirmation order: "Nothing in the plan or disclosure statement or plan support agreement will cause the release of any claim by any person who does not explicitly consent to the giving of such a release."

## **<u>CONCLUSION</u>**

For the reasons set forth above, the U.S. Trustee respectfully requests that the Court deny

confirmation of the Plan and grant such other and further relief as the Court deems just and

proper.

Respectfully submitted,


ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9


By:   _/s/ *Benjamin Teich*
        Benjamin Teich
        Trial Attorney

Dated: March 5, 2020